AUG 0 6 2004

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

GALE NETTLES

MAGISTRATE JUDGE DENLOW

CRIMINAL COMPLAINT

FILED
AUG - 5 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CASE NUMBER: 04CR0699

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning in or about December 2003, and continuing until on or about August 5, 2004, in the Northern District of Illinois, defendant did

attempt to damage and destroy by means of fire and an explosive a building owned and possessed by the United States, namely, the Everett M. Dirksen building in Chicago, Illinois;

in violation of Title 18, United States Code, Section 844(f)(1).

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: XX Yes ___ No

Sonjia K. Wing, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

August 5, 2004 at Chicago, Illinois
Date City and State

MORTON DENLOW, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS)
) SS
COUNTY OF COOK )

**AFFIDAVIT**

I, Sonjia K. Wing, hereinafter being duly sworn, depose and say:

1. I am a Special Agent for the Federal Bureau of Investigation (FBI) assigned to the Chicago Division in Chicago, Illinois. I have been employed as an FBI Special Agent for approximately one year. I have six years of previous law enforcement experience as a municipal law enforcement officer in the State of Colorado. My current duties as Special Agent include the full-time investigation of domestic terrorism crimes within the Joint Terrorism Task Force (JTTF).

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510(7), as a Special Agent of the FBI. As such, I am empowered to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, § 2516 and for other federal felony offenses.

3. This Affidavit is submitted in support of a criminal complaint against GALE WILLIAM NETTLES charging a violation of Title 18, United States Code, Section 844(f)(1), making it unlawful to maliciously attempt to damage or destroy, by means of fire or an explosive, any building in whole or in part owned or possessed by the United States, or any department or agency thereof.

4. As set forth below, there is probable cause to believe that beginning in or about December 2003, and continuing until on or about August 5, 2004, GALE WILLIAM NETTLES violated Title 18, United States Code, Section 844(f)(1), by attempting to damage and destroy by means of fire and an explosive a building owned and possessed by the United States, namely, the Everett M. Dirksen building in Chicago, Illinois (the "Dirksen building").

## I. SUMMARY OF INVESTIGATION

5. As explained in greater detail below, in approximately Fall 2003, while incarcerated in a federal prison, NETTLES advised a cooperating witness of his plan to blow up the Dirksen building using a truck bomb and discussed the use of ammonium nitrate fertilizer in constructing such a bomb. The cooperating witness provided that information to law enforcement authorities. In December 2003, following his release from prison and while he was residing at a Salvation Army work release center, NETTLES contacted another individual, who unbeknownst to NETTLES was a law enforcement officer acting undercover, to obtain the ammonium nitrate fertilizer. Throughout the period from NETTLES's release from prison through the time spent at the Salvation Army and up to and including the filing of this complaint, NETTLES has been under regular surveillance by the JTTF, and NETTLES has been in contact with undercover law enforcement officers and an individual cooperating with the JTTF.

6. On July 24, 2004, NETTLES rented a storage facility for purposes of storing the ammonium nitrate fertilizer he planned to obtain, and on August 4, 2004, NETTLES received delivery from an undercover law enforcement officer of approximately 500 pounds of purported ammonium nitrate fertilizer which he placed in the storage facility. Additionally, on August 5, 2004, NETTLES sold approximately 1500 pounds of fertilizer (purported to NETTLES to be ammonium nitrate) to an individual who was introduced to NETTLES as being affiliated with a terrorist organization but who was actually another law enforcement officer acting undercover. Through various investigative techniques including the use of undercover officers, confidential sources, physical surveillance and monitoring of NETTLES's phone activity, JTTF was able to monitor continuously NETTLES's activities and at all times was prepared to intervene before NETTLES's plot could be completed.

## II. DETAILS OF INVESTIGATION

7. As a result of my personal participation in this investigation, through interviews with and analysis of reports submitted by other Special Agents of the FBI, members of the JTTF, other law enforcement personnel, confidential sources, analysis of surveillance logs, pen register and trap and trace information, and wire interception, among other sources, I am familiar with all aspects of the investigation described in the affidavit. This information in the affidavit is not an exhaustive account of my knowledge of the events described. Rather, this is a summary submitted for the purpose of establishing probable cause in support of the Complaint to which the affidavit is attached.

8. On September 5, 2002, following GALE WILLIAM NETTLES's conviction the United States District Court for the Northern District of Illinois for violating Title 18, United States Code, Section 471, relating to the manufacture of counterfeit obligations of the United States, NETTLES was sentenced to a term of imprisonment of 24 months and a term of supervised release of two years. In a plea agreement in that case, NETTLES acknowledged manufacturing counterfeit United States currency using a home computer and related equipment.

9. Pursuant to that sentence, NETTLES was incarcerated at the Federal Correctional Institute in Yazoo City, Mississippi. A convicted felon who had been in contact with NETTLES ("CW1") began cooperating with law enforcement and provided information to the FBI that in approximately August 2003, NETTLES asked CW1 about ammonium nitrate, a fertilizer used in farming. According to FBI Bomb Technicians, ammonium nitrate can be combined with other materials to create a powerful explosive device. NETTLES asked CW1 if CW1 could assist NETTLES in obtaining ammonium nitrate after NETTLES was released. CW1 reported that NETTLES told CW1 that NETTLES is familiar with the Chicago federal courthouse and that NETTLES could easily load

a truck with ammonium nitrate and place it in the loading dock area of the courthouse and level the courthouse. NETTLES reportedly sketched out the courthouse in sand when describing it to CW1.

10. Working with the FBI, CW1 provided NETTLES with a telephone number of an individual who could purportedly help NETTLES obtain ammonium nitrate. That number in fact corresponded to an "undercover" telephone in Louisiana monitored by the FBI.

11. On October 27, 2003, NETTLES traveled from Yazoo City, Mississippi to the Salvation Army work release center in Chicago, Illinois, to complete his term of imprisonment.

12. While at the Salvation Army, NETTLES regained possession of his cellular phone. Shortly thereafter, NETTLES's cellular telephone number appeared on a Caller ID device connected to the FBI undercover phone. On November 25, 2003, an FBI Special Agent acting undercover called NETTLES and said that he saw his number on his caller identification. In a conversation recorded later that day, the FBI Special Agent offered to have his "bossman" call NETTLES. NETTLES told the Agent to have him call NETTLES's cell phone and that he has been using the nickname "Ben Laden."

13. On December 1, 2003, a JTTF law enforcement officer, acting undercover (hereinafter "UC1"), called NETTLES in response to NETTLES's call to the undercover phone. When UC1 asked NETTLES what he could do for him, NETTLES replied that maybe CW1 could explain it to him. UC1 said he spoke to CW1 and knows what NETTLES wants. UC1 told NETTLES that he could sell it to NETTLES for a little more than he paid for it. NETTLES said he would be released on December 26, 2003, and then would need to get organized. NETTLES said he would call back sometime in January.

14. NETTLES was released from the Salvation Army facility on December 26, 2003. Physical

surveillance revealed that NETTLES moved into the Wilson Club Hotel, 1124 West Wilson Avenue, Room 118, Chicago, Illinois, where he currently resides.

15. On January 7, 2004, CW1 spoke to NETTLES in a recorded conversation. CW1 stated that UC1 would be coming to Chicago in the next few weeks. CW1 asked NETTLES if he remembered what they had talked about, and NETTLES said yes. CW1 asked NETTLES if he was still serious. NETTLES stated that he was very serious. CW1 asked NETTLES if he wanted UC1 to come by and see him or call him when he is in the area. NETTLES told CW1 to tell UC1 to call NETTLES when UC1 was in the area. CW1 said that UC1 can get "it" (referring to ammonium nitrate) over there. NETTLES said he was going to get his computer from his attorney later in the week.

16. On January 13, 2004, a consensually recorded call was made by UC1 to NETTLES. UC1 and NETTLES agreed to meet the following day. NETTLES provided directions to his residence on West Wilson Avenue, Chicago, Illinois.

17. On January 14, 2004, UC1 met with NETTLES in person. The meeting was captured by video and audio recording devices. NETTLES stated in the meeting that he was trying to get his computer back from his attorney. NETTLES stated he that he was into graphic arts and was going to make money the old fashioned way (apparently referring to counterfeiting currency, as NETTLES discussed again later in the conversation). NETTLES explained the procedure for using ammonium nitrate in a truck bomb.

18. In that same meeting NETTLES stated that the federal courthouse downtown is blocking the view of the lake. NETTLES said he has a problem with the whole federal system, including the judge on his counterfeiting case. NETTLES stated there are actually two courthouses, one houses bankruptcy and handles other matters and across the street is the other courthouse. NETTLES

explained that one of the courthouses has the Attorney General's Office, the U.S. Marshal's Office, the District Court, and the Circuit Court of Appeals. NETTLES incorrectly stated during the conversation that the building is at 243 South Dearborn and is 22 stories high. NETTLES said that the first floor is open and there are elevator shafts.

19. NETTLES told UC1 during this meeting that he was waiting to get his computer up to get some money rolling. NETTLES said he needed time to get his money together and explained his plan to counterfeit money when he got his computer back from his attorney.

20. UC1 asked NETTLES during this conversation how much NETTLES wanted. NETTLES asked in response if a semi-trailer holds 20,000 pounds. UC1 stated that he was not sure if a semi-trailer full of ammonium nitrate could be set off. UC1 explained that perhaps drums of ammonium nitrate would be better to set off. NETTLES explained how the explosives could be set off. UC1 stated during the conversation that about 1200 pounds would make the statement NETTLES wants. NETTLES responded by stating that he wants to take out a couple of city blocks.

21. During this conversation UC1 asked NETTLES if NETTLES could get his hands on something to set it off. NETTLES stated he had a contact in Tennessee who has some dynamite. UC1 asked him about storage for the ammonium nitrate. NETTLES stated storage around him was expensive but that he knows someone who may be able to help him store it.

22. NETTLES asked UC1 if UC1 wanted some bogus money. NETTLES said he sells it for 20-30%. NETTLES stated he uses a laser-jet printer to print the money. NETTLES said passing it (counterfeit money) is something like passing a bad check.

23. On January 26, 2004, NETTLES was seen by law enforcement surveillance moving a computer printer and several boxes into 1124 W. Wilson Avenue, Chicago, Illinois, the hotel where

he resides.

24. Also on January 26, 2004, UC1 contacted NETTLES and asked him if he got his other operation up and running yet, referring to counterfeiting money as NETTLES had previously discussed. NETTLES said no. NETTLES told UC1 he got some of his computer equipment back today and that he still needs to get his main computer back.

25. On January 29, 2004, law enforcement surveillance observed NETTLES ride in a van to the address where the attorney who represented him in his federal counterfeiting prosecution worked. Surveillance later observed NETTLES exit the van outside his residence with a computer central processing unit.

26. On January 31, 2004, law enforcement surveillance revealed NETTLES obtained a central processing unit from a Salvation Army store.

27. On February 12, 2004, UC1 called NETTLES. NETTLES said that he was still having problems getting storage space, but was getting his computer set up. NETTLES stated that he still did not have a printer for his room. UC1 asked NETTLES if UC1 heard correctly that NETTLES was still trying to get a storage space set up. NETTLES replied: "Yeah, I'm still working on that definitely." NETTLES described how he had most of his computer equipment together, but he still had not produced any "product" yet. UC1 stated that he has a friend interested in some of it when NETTLES gets up and going.

28. In that conversation NETTLES described to UC1 how he now has three computers. According to NETTLES, one is old and inoperable, one has an inoperable hard drive and the third, a Packard, has a new hard drive, a new CD Rom and new software. NETTLES indicated that he needed a good printer. NETTLES told UC1 that as soon "as I get something up where I can start"

he will definitely call UC1.

29. On February 17, 2004, UC1 called NETTLES. UC1 asked if NETTLES has his computer up yet. NETTLES replied that he has to come up with some new software, specifically Adobe Photo Shop Version 4 or 5, with Microsoft Photo Editor, and a new printer. NETTLES also told UC1 that he needed a laser jet printer, 1200 dpi, color perfect.

30. UC1 said that he may know where he can get some computer software and hardware. NETTLES advised that he needed an original Photo Shop since a counterfeit copy will not install on his computer. NETTLES described his computer system as having Windows 2000 Professional loaded as the operating system, a 4-gigabyte hard drive, a 333 Pentium II processor, and 64-megabytes of memory, and a scanner. UC1 specifically asked NETTLES if he uses a digital picture or a scanner for his "product" or "the cash flow." NETTLES replied that he uses a scanner.

31. On February 25, 2004, NETTLES received a telephone call from UC1. UC1 asked how his computer is going. NETTLES advised that he is fine tuning it and installing a CD-RW drive into it. NETTLES indicated that he still does not have a printer.

32. In that conversation UC1 advised NETTLES that he has a brand new printer and Adobe Photo Shop software. UC1 told NETTLES that UC1 believes the computer equipment and software is stolen. NETTLES inquired as to whether the software still has the serial numbers with it. UC1 replied that it is new in the package. NETTLES told UC1 to mail it to 1124 W. Wilson, Chicago, Illinois, 60640. On March 7, 2004 NETTLES left a telephone message for UC1 that he had received the printer.

33. In late April 2004, a second cooperating witness, hereinafter referred to as CW2, befriended NETTLES and began speaking with NETTLES on a regular basis. CW2 has received payments

from law enforcement as a result of CW2's participation in this investigation. CW2 told NETTLES that CW2 has a friend who is interested in counterfeit currency.

34. On May 5, 2004, NETTLES told CW2 he had the computer equipment he needed to make the money, but that he needed the paper to make it.

35. On May 10 and May 14, 2004, CW2 showed NETTLES a total of five different samples of printing paper. NETTLES kept some of the paper but stated he did not prefer the samples because the paper was not waterproof and was too thick. Physical surveillance and additional conversations between NETTLES and CW2 revealed that NETTLES also purchased paper himself.

36. On May 20, 2004, NETTLES told CW2 he bought a new scanner at Circuit City.

37. On May 22, 2004, CW2 met with NETTLES at a restaurant on North Broadway in Chicago, Illinois. In a recorded conversation, NETTLES delivered CW2 $560.00 in counterfeit bills in exchange for $100.00 in U.S. Currency. The bills were in denominations of twenty dollar bills and all had a serial number of CB54072514C.

38. On May 27, 2004, CW2 met with NETTLES at the same restaurant on North Broadway in Chicago, Illinois. In a recorded conversation, NETTLES delivered CW2 $1,500.00 in counterfeit bills in exchange for $300.00 in U.S. Currency. The bills were in denominations of twenty dollar bills and all had a serial number of CL65890931C.

39. On May 28, 2004, CW2 met with NETTLES at the same restaurant on North Broadway in Chicago, Illinois. In a recorded conversation, NETTLES delivered CW2 $3,680.00 in counterfeit bills for a total of $700.00 in U.S. Currency. The bills were all twenty dollar denomination with serial number CL86890931C.

40. On July 7, 2004, CW2 met with NETTLES at the same restaurant on North Broadway in

Chicago, Illinois. In a recorded conversation, NETTLES delivered $52,300.00 in counterfeit bills for a total of $10,000 in U.S. Currency. The bills were all in denominations of one hundred dollars and all had a serial number of CB 83243568A. NETTLES returned $5000 of the genuine U.S. Currency to CW2 as payment for her brokering the deal with the individual who purportedly provided the genuine U.S. Currency and was purportedly receiving the counterfeit currency from CW2.

41. On July 17, 2004, NETTLES left a voice mail message on UC1's telephone. NETTLES said he sent him $8,800.00 priority mail which UC1 should receive Monday or Tuesday.

42. On July 21, 2004, UC1 received a priority mail package containing $9000.00 in counterfeit bills, all in denominations of one hundred dollar bills. On this same date, UC1 called NETTLES and told him he received the package. UC1 told NETTLES the bills looked good. NETTLES said he used copy machine paper and that he can work on the detail. UC1 told NETTLES he was not going to have access to the fertilizer much longer as he is getting out of the farming business. UC1 told NETTLES that the amount NETTLES sent was more than enough to pay for the fertilizer. UC1 asked NETTLES how much he was wanted. NETTLES replied that he needed enough to set off a two thousand pounder. In discussing storage, NETTLES said he would see what he could dig up.

43. On July 23, 2004, in a recorded conversation, NETTLES asked CW2 if CW2 knew anyone involved or associated with Al Qaeda or Hamas. NETTLES stated that Al Qaeda took out the World Trade Center on 9/11.

44. Later on July 23, 2004, in a recorded conversation, CW2 told NETTLES that CW2 knows an individual who is a member of one of those groups. CW2 stated that the individual drives a limousine and a cab.

45. On July 24, 2004, NETTLES executed a rental agreement to rent a 3'x4'x10' storage locker at a Public Storage facility in Chicago, Illinois and was given access to the locker beginning that day.

46. On July 25, 2004, NETTLES met with CW2 and the individual who CW2 purported to be a member of a terrorist group who in fact was an FBI Special Agent acting undercover (hereinafter "UC2"). The meeting was captured by video and audio recording devices. After being introduced to NETTLES, UC2 asked NETTLES what NETTLES had. NETTLES responded that he had half a ton of ammonium nitrate. When UC2 asked NETTLES if he had it ready, NETTLES said that he could make one phone call and have it in the city in two days. NETTLES told UC2 that it was currently in New Orleans. NETTLES added that he has a target in mind: the United States courthouse downtown. NETTLES said that half a ton could make a 3000 pound bomb, adding that he knows how to build them and set them up.

47. NETTLES asked the UC2 if he remembered Oklahoma City, when they took out the federal building there. NETTLES stated that what was used was ammonium nitrate. (Ammonium nitrate was in fact an ingredient in the bomb used in the 1995 attack on the Alfred P. Murrah federal building in Oklahoma City, Oklahoma.)

48. UC2 asked NETTLES how much he wanted for the fertilizer, and NETTLES responded that half a ton would be $10,000. UC2 told NETTLES that $10,000 was acceptable.

49. Later in the conversation, NETTLES asked UC2 if the target, the United States courthouse downtown, is acceptable. UC2 responded by saying that UC2 could not tell NETTLES what their plans are.

50. NETTLES told UC2 in this same conversation that he would make a phone call and have the fertilizer brought up and put into a storage locker.

51. On July 31, 2004, NETTLES again met with UC2, and the meeting was recorded by audio and video recording devices. NETTLES discussed that he had secured a storage facility, but has a problem making the exchange of fertilizer with UC2 at that location due to surveillance cameras. NETTLES explained again that his target would be the United States Courthouse downtown on South Dearborn Street. NETTLES stated that he thought the address was three-something South Dearborn, but he stated that he was not certain of the exact address. NETTLES mentioned that the building is the federal courthouse that houses the Seventh Circuit appeals court. He also explained again that there was another courthouse that handles civil matters that is directly across the street. He mentioned that if there was something placed between the two buildings, it would take both buildings down.

52. During this same meeting, NETTLES spoke about bringing down the building around 10 a.m. or 11 a.m. when the judges would be present. NETTLES said that people pay more attention when people that are injured, as opposed to when there is only physical damage to property. UC2 asked NETTLES about the prospect of persons not affiliated with judges being killed, and NETTLES explained that he sees this like a "combat strike" in which NETTLES said there are always friendly casualties.

53. Also in this meeting NETTLES described in detail how to make an explosive device, including the ingredients he would use in addition to fertilizer and how the explosives should be wired for detonation. NETTLES explained that the person who placed the bomb could get away quickly because of the close proximity of an expressway to the building.

54. On August 4, 2004, pursuant to an earlier request from NETTLES, UC1 drove to the storage facility NETTLES rented in Chicago, Illinois. NETTLES accepted delivery at that facility of what

UC1 purported was ammonium nitrate fertilizer. The material was actually a different, non-dangerous type of fertilizer. NETTLES took delivery of 10 boxes containing fertilizer, weighing an estimated 500 pounds. NETTLES and UC1 would have had difficulty safely stacking additional boxes in the storage facility.

55. Also on August 4, 2004, following the delivery of the fertilizer, NETTLES and UC1 traveled to a park in Chicago where NETTLES discussed the sale of fertilizer to UC2 that NETTLES anticipated occurring on August 5, 2004, including specific instructions on what UC1 was supposed to do during the sale.

56. On August 5, 2004, NETTLES and CW2 traveled to a park in Chicago, Illinois. Pursuant to NETTLES's instruction, UC1 arrived separately at the park at approximately 6 a.m. with a pickup truck containing approximately 1500 pounds of fertilizer, which had been purported to NETTLES to be ammonium nitrate fertilizer but in fact was a different, non-dangerous type of fertilizer. UC1 then departed the area on foot as NETTLES had requested. UC2 and two other law enforcement employees acting undercover and posing as his associates had arrived separately at the park. Pursuant to NETTLES's previous instructions, UC2 and his two associates transferred the fertilizer from UC1's pickup truck to another vehicle. NETTLES walked in the park during the transfer monitoring the transfer. NETTLES and CW2 then met with UC2 inside another vehicle, where NETTLES accepted delivery of $10,000 U.S. Currency from UC2 as previously agreed to between NETTLES and UC2.

57. The Everett M. Dirksen building is at 219 South Dearborn Street and is owned and possessed by the United States. It houses federal courts, including the Seventh Circuit Court of Appeals, as well as the United States Attorney's Office. It is directly across the street from another federal

building.

FURTHER AFFIANT SAYETH NOT.

Sonjia K. Wing
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence this 5th day of August, 2004.

MORTON DENLOW
United States Magistrate Judge